PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant, v. H. D. BROWN et al., Appellees.

No. 43359.

FEBRUARY 18, 1936.

Griffin & Griffin, for appellant.

L. H. Kingsbury, Robert B. Pike, and Larned F. Brown, for appellee W. S. Gilman.

HAMILTON, J.—The property involved in this litigation consists of a four-story brick building, situated upon Lot 6, Block 22, Sioux City East addition in Sioux City, Woodbury county, Iowa. In 1923, the Prudential Insurance Company of America placed a loan on this property of $50,000 at 5½ per cent interest per annum, payable semiannually, with install- ments of principal amounting to $1,000 to be paid annually, which loan came due November 15, 1933. The mortgage was executed by the then owners of the property, H. D. Brown and wife, Martha M. Brown. Mrs. Brown is now deceased, and H. D. Brown is insolvent. Appellee W. S. Gilman acquired title to this property in 1926, but did not assume or agree to pay the mortgage indebtedness. At the time the loan became due, the principal had been reduced by appellee Gilman to $42,000. The interest payments were paid in full, except the last semi- annual installment. The taxes were paid up to and including the first half for the year 1932. The agent of the insurance company, shortly prior to the time the loan became due, called on Gilman for the purpose of renewing the loan, and the com- pany stood ready and willing to extend the loan for a period of five years on the same terms. At that time Gilman declined to become personally liable on the indebtedness by signing a note or signing an extension agreement on the terms proposed.

Being unable to get together on the terms of a renewal or extension, the company started foreclosure proceedings in De- cember, 1933, and decree of foreclosure was rendered May 18, 1934, and the property sold at execution sale June 18, 1934. The full amount due on the date of the sale was $45,764.33, and the company bid in the property at $1,000 less than this amount. The judgment draws interest at 8 per cent. No con- tinuance was asked for under the moratorium statute. Plain- tiff asked for a receiver, which was resisted, and the court re- fused to appoint a receiver, although the property sold for less than the amount of the debt. Hence, all the rents have gone to Mr. Gilman, who in turn has paid no taxes since 1932. In a letter to the agent of the company, dated October 25, 1935,

Mr. Gilman stated: "I expect to get every dollar out of this property I can get in the way of rent to try to reimburse me to some extent for a loss on this property of over $80,000.00." At the same time he called the company's attention to the danger of the plumbing freezing and declined to make any outlay of cash necessary to employ a plumber to look after turning off the water, and this was done at the expense of the company. Henry P. Lowenstein, agent for the company, testified: "It finally got down to the point where The Prudential thought he should pay five and one-half per cent interest and he wanted to renew the loan at five per cent." Gilman testified to a meeting before the conciliators board as follows: -"We had a hearing before the conciliators board here and I made them a proposition that I would pay them $3,000 cash and pay up the interest and taxes within a year, and $250 every quarter if they would give me a ten-year loan at five per cent. The proposal was rejected."

A few days before the period of redemption had expired, this application for an extension of the period of redemption to March 1, 1937, was filed and the matter set down for hearing and notice given prior to the time the period of redemption expired, and upon the hearing the trial court granted the extension. In a written opinion filed, the court states in his findings:

"That the undisputed evidence in this case shows that said real estate had been appraised for the plaintiff herein, at the time of the execution of said mortgage to plaintiff, at one hundred fifty thousand dollars ($150,000) and that in March, 1934, the said property was appraised for plaintiff at ninety thousand dollars ($90,000). And the court finds that the present reasonable value of said property is at least ninety thousand dollars ($90,000) with a reasonable expectation of further increase in value.

"That the defendant, W. S. Gilman, can reasonably expect to arrange for a redemption by March 1, 1937.

"That a hearing was had upon plaintiff's application in the foreclosure proceedings, for a receiver, and judgment and decree of this court entered on or about the 15th day of December, 1934, denying said application for a receiver, under which judgment and decree the court found that there was no

such a showing of inadequacy of security as would jeopardize the rights of the plaintiff herein, and that it would be inequitable on the part of this court to take away from the defendant W. S. Gilman, the rentals and profits during the year of redemption. That said judgment and decree was not appealed from by plaintiff herein."

These findings of the court as to the value find ample support in the evidence. The court further found:

"That the plaintiff has not shown that good cause exists for not granting an extension of the period of redemption, and the court finds that the application should be granted, subject to the conditions hereinafter prescribed."

This building is peculiarly constructed. Just east across the alley is located a hotel building, and the three upper floors of the building involved in this suit are connected by a hallway with this hotel building across the alley and the rooms are fitted for hotel purposes with thirty-nine bath rooms. There is no elevator or stairway connecting the lower floor with the three upper floors, and no way of ingress or egress to said three stories, except a fire escape on the outside. It has no heating plant. It appears that the building was erected as an annex to the hotel property and is known as West Hotel Annex. At the time Gilman purchased it, it was bringing in an annual income of $16,800. During the years of the depression the hotel company was evicted from the hotel building and no satisfactory lease has been made with the present occupant of the hotel property, the difficulty arising over the fact that the Prudential Company and Gilman have been unable to agree upon terms of extending the loan, and the operator of the hotel is not willing to enter into any short term arrangement, because of the outlay of money necessary to furnish the rooms for hotel purposes. The burden of Gilman's contention is that the property will not pay the carrying charges of interest, taxes, etc., unless it can be rented satisfactorily, and that it will require some considerable money expended to fix up the rooms in order to make them habitable, and will require considerable more money to put in an elevator and stairways necessary to equip the building in controversy as an independent hotel building.

The serious question in this case, is, Do the facts bring it

within the provisions of the moratorium statute (Acts 46th General Assembly, chapters 109, 110)? Certainly the moratorium statute was not intended to enable the debtor to drive a sharp bargain with his creditor, but was intended to protect one in distress financially, who, because of this, was unable to meet the terms of his contract. In this case we find the agent of the company holding the mortgage coming to the property owner before it became due, offering to extend on the same terms, except that a commission was required, and, after the suit was started, three different propositions were made by the company to the property owner, none of which was drastic in its terms, but all of which were rejected, and the company had no other recourse except to accede to the terms demanded by the property owner, or to foreclose and take the property. In the meantime, taxes and interest were piling up at the rate of some $5,500 a year. There is no showing in this record that the appellee could not meet the terms of the extension agreement tendered by the company, but that he would not. Not being personally liable on the indebtedness, apparently the appellee made up his mind, and so stated to the company, that unless they saw fit to come to his terms and extend the loan at 5 per cent, he would continue to collect the rents and get all out of the property he could. He advised the company that in his judgment they were making a mistake in not acceding to his terms, and in going ahead with their foreclosure. There is no law to compel appellee to put any additional money into this loan. He is not personally liable and the company cannot force him to become personally liable.

Should the court construe the moratorium statute so as to make it an instrument in the hands of appellee or any other creditor similarly situated to dictate terms of an extension agreement or renewal of the loan? True, there is considerable equity above the indebtedness. This property is favorably located near the business center of the town. There is need of additional hotel quarters. By proper co-operation, this property could probably be rented. Conditions are improving and the property is probably worth as much or more at this time than at the time of the trial. It is little more than a year until the period of redemption under the order of the court will expire. Under such circumstances, has the lower court abused his limited dis-

cretion in granting this extension? That is the question we are required to determine.

It is plainly apparent that at the time the foreclosure action was begun and up to the time the decree was granted, appellee manifested little desire to retain the property or obligate himself to pay the debt. However, there has been a material change in economic conditions throughout the state of Iowa since 1933 and apparently at the time the application for an extension of the time of redemption was filed appellee had become more interested in retaining the property, and he now manifests a disposition to attempt to refinance the loan. In his testimony at the hearing he said: "I am doing everything in my power to arrange a refinancing of the loan. If an extension is granted in this case, and if some arrangement can be made so that a reasonable lease can be made on the property, I think there will be a reasonable probability of refinancing the loan on the building. It is my whole purpose to try to arrange a reasonable lease, and I believe it would be for the interests of everybody concerned. I am willing to enter into a lease arrangement with any receiver appointed by the court and with the plaintiff. I am not trying to use the Moratorium Law arbitrarily for the purpose of forcing the plaintiff to grant a new mortgage on my terms. I am not trying to force a loan by the plaintiff. If I was in their position I would make this kind of a deal—accept the proposition I made them. I would enter into a lease." He further testified: "I am discouraged about the attitude of the company and don't know that they would enter into an agreement at all. A lease could be made if we could work in harmony, but if The Prudential wants to block it they probably could. I am willing to enter into a lease."

On cross-examination he said: "I can't make any new loan on the property because I haven't any lease, but if I had a lease signed for $6,600.00 I could make a new loan on it without any trouble and I wouldn't have to go to The Prudential Insurance Company for it, either. I have been asking The Prudential to sign a long time lease because I have to get a lease before I can refinance, and the manager of the West Hotel insists that The Prudential Insurance Company consent to a lease before he will go into it. I don't know that I can refinance it but I think I can. I can't do it until I have got the lease signed. * * * If I had that lease signed by the owners of the West

Hotel I would be willing to personally sign the note and mortgage. The whole proposition rests on whether, I can get a satisfactory lease from the West Hotel. The manager of the West Hotel said he would be willing to pay $200.00 a month and I thought he ought to pay $250.00, and then he talked about making a $500.00 lease on the entire building. He just talked about it. That was about ten days ago. He said he had some way of raising money during July, this year. I have been talking to him for over a year about this matter. * * * The controversy with The Prudential over the renewal was the question of whether the interest rate would be five per cent or five and one-half per cent and whether the loan would be for five years or for ten years." In reference to his ability to meet the interest and taxes at the time the loan fell due, he said: "I had already defaulted in some taxes, and it was more money than I could raise at that time. There was a half year's taxes delinquent and six months' interest, and that was a very big item at the time the loan came due. It looked pretty gloomy then, and it don't look any too bright right now." In reference to the propositions made to him by the Prudential, he said: "I felt that 5 per cent was an ample rate to pay. That wasn't the whole trouble, but I still think they might have conceded that much. I didn't feel any of their propositions were favorable. I offered to pay them $3,000 cash, five per cent interest, and pay up the back installments within a year. I thought that was a reasonable proposition. If I had been on the other side of the fence, I would have grabbed it in a minute."

It is plainly apparent that the crux of the whole difficulty lies in the failure to procure tenants. The only tenant possible for the three stories fitted for hotel purposes as the building now stands is the proprietor of the hotel. The hotel company is not willing to invest any money in fixing up and furnishing the rooms unless they can have a long term lease. A long term lease is impossible unless the Prudential Insurance Company and Gilman can agree. So far they have been unable to agree and the record fails to indicate any reasonable probability of an agreement within the period of the extension. Gilman does not, in his own testimony, hold out any hope of being able to refinance this loan unless and until he is able to lease the building under favorable terms whereby the property would be bring-

ing in some $6,600 annually, and the matter stands in this deadlock.

The lower court in the exercise of his reasonable and limited discretion in the matter has granted the extension. In view of the large equity, which appears by a preponderance of the evidence, above the amount of the indebtedness, we are loathe to interfere with the decision of the lower court, especially in view of the fact that even though appellee does not succeed in successfully refinancing, there appears to be ample security for the debt, with all accumulations that may arise within the period of the extension, and therefore the company will sustain no loss in fact. On the other hand, it is with considerable hesitancy that we overlook the conduct of appellee in failing to accept the offer made by the plaintiff to extend this loan prior to the time the foreclosure action was started. We also have some misgivings relative to appellee's ability to refinance the loan, and if he fails, the company will again be confronted with the same situation at the end of the extension period. Yet, in view of the change which has taken place in economic conditions and the apparent good faith effort that has been made by appellee to refinance this loan, the large equity in the property above the indebtedness, and the tremendous loss which appellee will sustain if this extension is not granted, and in view of the fact that the trial court is on the ground and had the witnesses before him and is in a better position to weigh the conflicting circumstances and to judge of the ability of appellee to refinance the loan, we are constrained to hold that the trial court did not abuse his limited discretion and to affirm his order.—Affirmed.

DONEGAN, C. J., and MITCHELL, PARSONS, ANDERSON, and KINTZINGER, JJ., concur.